**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

UNITED STATES OF AMERICA,          :

                              :

             Plaintiff,     :

          v.           :  Case No. 1:17-Cr-00019 (RMB)

                              :

RICHARD USHER,               :
ROHAN RAMCHANDANI, AND    :
CHRISTOPHER ASHTON,      :

                              :

            Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE UNITED STATES'**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTIONS IN LIMINE**

Jeffrey D. Martino, Chief
Carrie A. Syme
Bryan C. Bughman
David Chu

*United States Department of Justice*
*Antitrust Division, New York Office*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

OPPOSITION TO FIRST MOTION  TO EXCLUDE ANY REFERENCE TO BANK GUILTY PLEAS ............................................................................................................ 1

I.  The Confrontation Clause is Not Implicated by Evidence of the Bank Pleas ................... 1

II.  Defendants May Open the Door to Evidence of the Bank Pleas and the Government Must Be Able to Respond .......................................................................... 2

III.  Evidence of the Bank Guilty Pleas Will Not Be Unduly Prejudicial ................................ 5

IV.  Any "Unregulated Market" Defense Should be Excluded ............................................... 6

OPPOSITION TO SECOND MOTION TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING "SPOOFING" ......................................................................... 7

I.  Spoofing Is Intertwined with the Offense and Is Direct Evidence of the Conspiracy ........ 8

II.  Spoofing Is Relevant to Intent and Is Permissible Under Rule 404(b)(2) ....................... 10

III.  The Limited Spoofing Examples are Not Unduly Prejudicial Under Rule 403 ............... 11

OPPOSITION TO THIRD MOTION TO EXCLUDE EVIDENCE OF ALLEGED NON-COMPLIANCE WITH  BANK COMPLIANCE POLICIES ..................................... 12

I.  Defendants' Specific Examples of Compliance-Related Evidence Clearly Reveal Their Probative Nature ......................................................................................... 12

   A.  Defendant Usher Exhibits ....................................................................... 13

   B.  Defendant Ashton Exhibits ...................................................................... 15

II.  The Probative Value of the Evidence Substantially Outweighs any Potential Unfair Prejudice or Confusion ............................................................................... 17

III.  The Evidence Demonstrates the Existence of the Conspiracy and Defendants' Participation Does Not Constitute Remedial Measures .................................................. 19

OPPOSITION TO FOURTH MOTION TO EXCLUDE EXPERT TESTIMONY OF JEREMY N. TILSNER AND EBS-ONLY MARKET SHARES ............................................... 20

I.  Tilsner is Qualified to Testify About the Data in this Case ............................................ 20

II.  Tilsner's Data Analysis Corroborates the Existence of the Conspiracy ........................... 21

   A.  Tilsner's analysis of EBS data corroborates the existence of the conspiracy. .............. 21

   B.  Tilsner's bank data analysis corroborates the existence of the conspiracy. ................. 22

III.  None of Defendants' Arguments to Exclude Tilsner's Testimony Have Merit ............... 23

   A.  Tilsner is not defining a relevant product market, which is an irrelevant concept in this per se case. ............................................................................................. 23

B.   Tilsner will testify about his own review and analysis of the data, not the statements of bank representatives. ........................................................................................................... 24

C.   Tilsner's testimony regarding EBS trading is not misleading, because that is a platform where Defendants executed the conspiracy. .......................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States*,
   417 U.S. 211 (1974) ................................................................................................. 20, 21

*Arlio v. Lively*,
   474 F.3d 46 (2d Cir. 2007) ................................................................................................. 7

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ......................................................................................................... 23

*CDC Techs., Inc. v. Idexx Labs. Inc.*,
   7 F. Supp. 2d 119 (D. Conn. 1998) ................................................................................. 23

*English v. District of Columbia*,
   651 F.3d 1 (D.C. Cir. 2011) ............................................................................................. 19

*Hartford Fire Insurance Co. v. California*,
   509 U.S. 764 (1993) ................................................................................................... 23, 24

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
   No. 04-md-1628 (RMB), 2009 WL 3241401 (S.D.N.Y. Sep. 30, 2009) ......................... 23

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .................................................................................. 2, 5, 19

*United States v. Brown*,
   913 F. Supp. 1324 (D. Minn. 1996) .................................................................................. 6

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000) ................................................................................................. 8

*United States v. Diaz*,
   176 F.3d 52 (2d Cir. 1999) ................................................................................................. 5

*United States v. Goffer*,
   721 F.3d 113 (2d Cir. 2013) ............................................................................................... 4

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) ............................................................................................... 8

*United States v. Jamil*,
   707 F.2d 638 (2d Cir. 1983) ........................................................................... 17

*United States v. Jimenez*,
   789 F.2d 167 (2d Cir. 1986) ........................................................................... 18

*United States v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981) ...................................................................... 17, 19

*United States v. Locasio*,
   6 F.3d 924 (2d Cir. 1993) ............................................................................... 24

*United States v. Marrale*,
   695 F.2d 658 (2d Cir. 1982) ............................................................................. 2

*United States v. Massimo*,
   319 F. Supp. 2d 295 (E.D.N.Y. 2004) ............................................................. 5

*United States v. Mickens*,
   926 F.2d 1323 (2d Cir. 1991) ......................................................................... 18

*United States v. Pascarella*,
   84 F.3d 61 (2d Cir. 1996) ............................................................................... 11

*United States v. Perez*,
   387 F.3d 201 (2d Cir. 2004) ...................................................................... 17, 18

*United States v. Ramirez*,
   894 F.2d 565 (2d Cir. 1990) ............................................................................. 4

**Rules**

Fed. R. Evid. 404(b) ........................................................................................... 10

Fed. R. Evid. 407 ............................................................................................... 19

**Other Authorities**

Michael Melvin & John Prins, *Equity Hedging and Exchange Rates at the London 4 p.m. Fix*,
22 J. of Fin. Mkts. 50, 53 (2015) ............................................................... 21, 22

## INTRODUCTION

The Government respectfully submits this memorandum of law in opposition to Defendants' motions in limine: (1) Motion to Exclude Any Reference to Bank Guilty Pleas; (2) Motion to Exclude Evidence and Argument Concerning "Spoofing"; (3) Motion to Exclude Evidence of Alleged Non-Compliance with Bank Compliance Policies; (4) Motion to Exclude Expert Testimony of Jeremy N. Tilsner and EBS-Only Market Shares.

## OPPOSITION TO FIRST MOTION
## TO EXCLUDE ANY REFERENCE TO BANK GUILTY PLEAS

The Government has no intention of making affirmative use of the guilty pleas entered into by the parent companies of Defendants' former employers, which were based on Defendants' own conduct as charged in this case.[1] But if Defendants open the door at trial—including by arguing for an acquittal if they met the "market standard" of behavior or if their employers approved their conduct—evidence of the bank pleas may be a necessary and legally appropriate rebuttal.

### I.   The Confrontation Clause is Not Implicated by Evidence of the Bank Pleas

First and foremost, admission of evidence regarding the bank guilty pleas raises no concern under the Confrontation Clause. If evidence of the pleas becomes relevant at trial, the Government intends to call to the witness stand the signatories of one or more of the plea agreements or other witnesses competent to testify to the substance of the guilty pleas, and

---

[1] *See* Decl. of Michael Kendall in Supp. of Defs.' Mots. in Lim. (Doc. No. 120), Ex. A (March 2015 plea agreement for Barclays PLC, parent company of the bank that employed Defendant Ashton). The plea agreements for Citicorp (parent company of the bank that employed Defendant Ramchandani) and JPMorgan Chase & Co. and The Royal Bank of Scotland (parent companies of banks that employed Defendant Usher) are substantially similar. Although Defendants are not named in the plea agreements, paragraphs 4(g)-4(i) of each state that the plea is premised upon *(inter alia)* the conspiracy entered into by members of The Cartel, the collective name used by Defendants and their individual co-conspirator.

Defendants will be able to cross-examine these witnesses. As a result, the admissibility of the bank guilty pleas in this case raises no Constitutional concern and may be decided solely under the rules of evidence.

## II. Defendants May Open the Door to Evidence of the Bank Pleas and the Government Must Be Able to Respond

It is Defendants themselves who appear ready to open the door to such evidence. In that event, the law allows a fair rebuttal. "[A] prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense . . . ." *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982). Accordingly, if a defendant voluntarily raises an issue of fact at trial, the Government is entitled to refute it directly with facts of its own, even if that evidence might have been inadmissible had the prosecutor used it affirmatively. *See United States v. Bilzerian,* 926 F.2d 1285, 1295–96 (2d Cir. 1991). Evidence of the bank guilty pleas would be a direct refutation of certain defense proof at trial. While Defendants' evidence and arguments are irrelevant—and, accordingly, the Government has moved in limine to exclude them (*see* Doc. No. 116) —Defendants' pretrial filings and disclosures nonetheless indicate that they intend to devote time and evidence on these points:

**Market Benefit/Market Standard**: The cornerstone of Defendants' trial defense appears to be that their participation in the alleged conspiracy was well within the "customs, norms, or expected behaviors" of the foreign exchange ("FX") market and benefitted the operation of the FX market as well as its individual participants. (*See* Doc. No. 116, 5–6). The bulk of Defendants' proposed trial evidence is keyed to these issues, including hundreds of trial exhibits, at least four fact witnesses, and both of Defendants' expert witnesses. *Id.* Defendants also propose instructing the jury that if Defendants "merely acted in accordance with" market standards, it is grounds for acquittal. (*See* Doc. No. 114, Defs.' Proposed Final Instr. No. 3.40).

This strategy opens the door to Government rebuttal evidence, including the bank guilty pleas. If, for example, a defense expert is allowed to testify that Defendants' conduct was within the bounds of the "market standard" to suggest that the conduct was permissible, the Government should be able to cross-examine him with evidence that, to the contrary, Defendants' employers admitted that the conduct was against the law.

**Bank Approval/Lack of Intent**: Defendants also intend to argue that bank supervisors or administrators were fully aware of Defendants' participation in the alleged conspiracy and encouraged them to engage in that conduct. (Doc. No. 116, 6.) Defendants are likely to argue that they should be acquitted because the banks' condoning their conduct meant Defendants had no idea what they were doing was wrong. (*See* Doc. No. 114, Defs.' Proposed Final Instr. No. 3.22 (defendant acts knowingly only when he "kn[ows] the unlawful goal of the agreement"); Defs.' Proposed Final Instr. No. 3.24 (jury must find "that unlawfully fixing the price was the Defendants' goal"); Defs.' Proposed Final Instr. No. 3.25 (conscious commitment to a common scheme means, in part, that Defendants "would have understood its unlawful purpose.")). If a Defendant or other witness testifies accordingly, the Government should be able to cross-examine that witness with facts tending to show that the bank did *not*, in fact, condone the Defendant's behavior. Among those facts is the bank's guilty plea, admitting that the Defendant's conduct was criminal.

**Expert Testimony Regarding Collusion**: Defendants propose expert testimony from Prof. Edward A. Snyder, including his opinion—based on no personal experience—that the market for the exchange of Euros and U.S. Dollars ("EUR/USD") "does not lend itself to anticompetitive coordination" and Defendants' trading practices "do not exhibit indicia of cartel behavior." (*See* Doc. No. 119, Ex. 1 ¶ 15.) This, too, opens the door to evidence of the bank

3

pleas. Surely the fact that some of the world's largest EUR/USD trading banks have admitted to doing exactly what Prof. Snyder has testified is unlikely to happen would be fair cross-examination or rebuttal.

The fact that the banks pled guilty in 2015, whereas the conduct they were pleading guilty to took place earlier (2007–2012), is not a reason to exclude them, as Defendants suggest. That is a matter of evidentiary weight, not admissibility. The Second Circuit cautions that "[r]elevancy cannot be reduced to [a] mere chronology; whether . . . evidence occurred prior or subsequent . . . is not necessarily determinative to its admissibility [and therefore its probative value]." *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (alterations in original) (quoting *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990) (no error to admit defendant's statements that occurred after alleged fraud to prove his intent because "subsequent acts are frequently probative of intent")). The banks' admission of guilt remains relevant because it tends to rebut Defendants' claims, as demonstrated above, even if it is not conclusive.

For the same reasons, the Court should reject Defendants' related argument to exclude proof of other "regulatory or law enforcement activity concerning any bank." (Doc. No. 118, 7 n.3.) This "regulatory or law enforcement activity" is discussed in detail in the Government's memorandum of law supporting its motions in limine (Doc. No. 116, 11), as well as the Syme Declaration in support thereof (Doc. No. 119, ¶¶ 17–24). The Government will not seek to introduce these other enforcement actions unless Defendants open the door, such as by arguing that their conduct met market standards or by admitting the March 15, 2016 letters from the UK Serious Fraud Office in which the agency stated it declined to charge Defendants. The enforcement actions would become directly relevant in rebuttal. For example, the jury could reasonably conclude that, given the prosecutorial and regulatory actions against FX traders'

conduct in the years 2007 through 2012, to the extent there was a "market standard" of behavior among traders, it was plagued by illegal and anticompetitive conduct, and Defendants, far from being average FX traders, were among the worst actors.

If the Court grants the Government's motion to exclude Defendants' irrelevant evidence, including Prof. Snyder's testimony, then there may be no reason for the Government to propose admitting evidence of the bank pleas at trial. But if not, Defendants cannot open the door and then prevent the Government from reasonably responding.[2]

## III.   Evidence of the Bank Guilty Pleas Will Not Be Unduly Prejudicial

Defendants' assertion that any probative value of the bank pleas will be significantly outweighed by undue prejudice is unfounded. Defendants confuse prejudice with "undue" prejudice. This evidence is not *unduly* prejudicial, and may be admitted, if it fairly rebuts a false impression left by the defense. *See Bilzerian,* 926 F.2d at 1295–96; *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999). In fact, "evidence whose probative value might not ordinarily outweigh its prejudicial effect if offered on direct examination is admissible to rebut testimony elicited on cross examination that created a false impression." *Bilzerian*, 926 F.2d at 1296.

None of the cases cited by Defendants suggest that guilty pleas are inherently too prejudicial to ever admit at trial. In *United States v. Massimo*, the court held the co-conspirators' guilty pleas were "not particularly probative" of a witness's credibility and posed an abnormally high risk of prejudice because of the sheer number of pleas—thirty in total. 319 F. Supp. 2d 295,

---

[2] In their motion, Defendants claim there are two other situations in which the Government would seek to introduce the bank guilty pleas at trial: (i) if Defendants claim that the banks endorsed the use of multi-party chat rooms, and (ii) if Defendants claim the global FX spot market is not regulated. (Doc. No. 118, 11.) Neither is correct. The Government will not, and has never said it would, consider either of those defenses to open the door to the bank guilty pleas; instead, it will respond with other evidence. Moreover, the "unregulated market" defense should be precluded altogether. *See infra* at Part IV.

300 (E.D.N.Y. 2004). In *United States v. McLellan*, the court called a deferred prosecution agreement "at best, weakly probative" of an element of fraud, without further explanation. Orders on Pretrial Mots. ¶ 14, No. 16-cr-10094-LTS (D. Mass. Jun. 1, 2018), ECF No. 405. Finally, in *United States v. Brown*, the "evidence" regarding a former co-defendant's guilty plea was not evidence at all, but rather a rumor started by a juror in the jury room. There was no suggestion in *Brown* that the guilty plea was probative of anything and the court did no Rule 403 analysis. 913 F. Supp. 1324, 1328–1332 (D. Minn. 1996).

To eliminate any remaining concern regarding prejudice, the Government would consent to an instruction limiting the jury's consideration of the bank guilty pleas to their evaluation of the particular issues raised by the defense. Similar instructions have been used in prior cases.[3]

## IV.   Any "Unregulated Market" Defense Should be Excluded

As part of their motion, Defendants claim they will put an "incontrovertible fact" before the jury—that "the global spot FX market is not regulated"—which they claim provides the jury with "basic context" about the market. (Doc. No. 118, 6.) The Court should exclude any evidence or arguments regarding the alleged "unregulated" nature of the FX spot market. At the final pretrial conference, the Government will make an oral motion to include this as part of its Motion in Limine to Exclude Evidence and Argument Irrelevant in a Per Se Case.

Defendants are charged with violating a federal criminal law, not a regulation. It is therefore irrelevant whether any regulations applied to Defendants' conduct, and evidence and

---

[3] For example, in the LIBOR fraud case going to trial shortly before Judge McMahon, the court ruled in limine that the government could admit evidence of Deutsche Bank's deferred prosecution agreement ("DPA") with the Department of Justice for purposes of establishing the government's compliance with the statute of limitations for crimes affecting a financial institution. The court intends to give a limiting instruction that such evidence should not be used to infer that defendants, former Deutsche Bank employees, committed the crime that was the subject of the DPA. *See* Decision on Gov't Mots. in Lim. at 22, *United States v. Connolly*, No. 16-cr-00370-CM (S.D.N.Y. May 15, 2018), ECF No. 262.

arguments in this regard should be excluded under Rules 401 and 402. *See Arlio v. Lively*, 474 F.3d 46, 52–53 (2d Cir. 2007) (evidence or arguments not relevant to "a matter properly provable in the case" are not admissible).

In addition, Rule 403 requires exclusion of the "unregulated market" point, even as mere "background," because it is *demonstrably* and *objectively false* and thus would cause confusion and mislead the jury. Regulators in the United States, United Kingdom, and other countries have brought enforcement actions against all three Defendants, their banks, and many others for violating regulations applicable to their conduct in the FX spot market. (Doc. No. 119, ¶¶ 17–24.) The regulated nature of the FX spot market is not a matter of disputed fact; it is simply true. The Court should exclude Defendants' proposed evidence and arguments on this subject matter.

For the foregoing reasons, the Court should deny Defendants' motion.

## OPPOSITION TO SECOND MOTION
## TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING "SPOOFING"

The Court should deny Defendants' motion to exclude evidence and argument concerning spoofing. The spoofing evidence the Government seeks to offer is inextricably intertwined with the charged offense and is thus relevant to proving that Defendants entered into an illegal agreement to restrain trade.  It is therefore not subject to Federal Rule of Evidence 404(b). Even if the Court were to find that Rule 404(b) applies, the evidence is properly admitted under Rule 404(b)(2) because this evidence is also offered to show, on the specific occasions when Defendants engaged in spoofing, that they intended to influence the price of EUR/USD, which was the same goal of the charged conspiracy. Spoofing evidence is relevant, and its probative value to show both the charged offense and Defendants' intent is not substantially outweighed by any danger of confusion or unfair prejudice. Evidence of spoofing is therefore admissible under Rules 401, 402, and 403.

## I.     Spoofing Is Intertwined with the Offense and Is Direct Evidence of the Conspiracy

Under well-settled law, evidence of another crime, wrong, or act is not subject to Rule 404(b) "if it is inextricably intertwined with the evidence regarding the charged offense." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). In this case, Defendants' spoofing conduct arose out of the same series of transactions as the charged offense, and is thus inextricably intertwined with it.

The Indictment charges that, in furtherance of their agreement to suppress and eliminate competition, Defendants refrained "from trading against each other's interests and coordinat[ed] their bidding, offering and trading [by] . . . refraining from bidding, offering and trading at certain times." (Doc. No. 1, ¶¶ 23(b) and (c)). The Government will show, through the testimony of Witness A and through other evidence, that this type of trading coordination occurred when one member of the conspiracy indicated that he needed to trade EUR/USD in the market and was thus at risk that the price of the currency would move against him (i.e., become more expensive when he needed to buy, or cheaper when he needed to sell). The evidence will show that Defendants, pursuant to the charged agreement, then refrained for a specific period of time from any proprietary buying/selling in the market that may have moved price against their co-conspirator. This time lasted as long as the at-risk trader needed to trade in the market, and Witness A will testify that the conspirators often signaled when this period ended by saying things such as "clear." Agreeing to withhold buying/bids or selling/offers from the market in order to reduce competition, rig a bidding process, and fix prices is a classic example of a *per se* violation of the Sherman Act.

Witness A will explain that during the charged conspiracy, he and Defendants refrained from trading on one another's spoofing to advance the same objective as the conspiracy – to stabilize, raise, or lower price for one another's benefit. To spoof, a trader typically places in the

market large bids or offers which the trader does not intend to execute. Spoofing creates the impression that there is buying or selling interest at a certain price level that does not in fact exist A spoof bid or offer is thus a fake because it does not represent real trading interest; instead, its purpose is to stabilize or otherwise influence the price of the currency. As Witness A will testify, and other evidence will support, as part of their continuing chatroom communications, Defendants sometimes indicated to each other that they were engaged in spoofing in EUR/USD by, for example, referring to their bids as "bs," "bull sh**," or "fake," and sometimes explicitly as "spoofs." Witness A will testify that in such instances, he and his co-conspirators, just as described above, agreed to refrain from trading on those spoof bids or offers in order to help the first trader rig the bidding process and affect price. This spoofing-related conduct was contemporaneous with, and had the same purpose as, the conduct alleged as a means and methods of the antitrust violation described in the Indictment at paragraphs 23(b) and (c).

The Government has placed on its exhibit list several examples it intends to offer in its case-in-chief in which the Defendants engaged in spoofing that is intertwined with conduct charged in paragraphs 23(b) and (c) of the Indictment. *See* Syme Decl. in Supp. of Gov't's Opp. to Defs.' Mots. in Lim., filed herewith ("Syme Decl. II."), ¶ 2 (all typos are in the original chat transcripts).

- On February 14, 2008, Defendant Usher indicated that he was at risk (long), triggering the type of coordination charged in the Indictment, and indicated that "my bids . . . all bull sh**." Defendant Ramchandani responded "okmate cheers." Usher then indicated that he was no longer at risk by saying "clear even."

- On April 4, 2008, Defendant Usher indicated that he had become short and stated that he was "gonna spopoif lowe," which Witness A will testify he understood to mean that Usher was spoofing to try to push the price lower so Usher could buy EUR/USD more cheaply. Usher then asked the other traders to "stay out tht e way plse." Defendant Ramchandani replied "of course."

- On February 3, 2012, Defendant Usher stated that he was at risk (short). During this period, Witness A asked Usher "these yr offers?" in order to determine

whether Usher was spoofing and to identify which offers Witness A should leave alone. Usher replied "y" and later stated that he was no longer at risk ("clr").

- On November 27, 2012, Defendant Usher stated that he was at risk (short). During this period, Usher noted "that's my bs offer" to indicate which offers the other should not trigger by buying.

As these examples make clear, spoofing was an additional tactic that a Defendant employed to reinforce the desired price effect, and his co-conspirators facilitated that price effect by coordinating their trading, by refraining from buying or selling in a manner that would ruin the spoof. This is evident in the April 4, 2008 episode when Defendant Usher tells his co-conspirators that he was going to spoof the price "lowe" and asks them to "stay out tht e way pls" (which refers to the charged conduct of refraining from trading). It is also evident in the February 3, 2012 example above. Witness A will testify that he asked Defendant Usher if certain offers were spoof offers. When Usher answered "y" for yes, Witness A knew to leave those offers alone (i.e., not to trade by buying).  Leaving bids or offers alone—to "stay out tht e way" as Usher states—thus completes the story of how the conspirators worked together during the charged period. Without an agreement to engage in such conduct, the conspiracy would have failed to meet the objective of affecting price. Evidence of spoofing is therefore intertwined with the charged offense and is not prohibited by Rule 404(b).

## II.    Spoofing Is Relevant to Intent and Is Permissible Under Rule 404(b)(2)

Even if the Court finds that spoofing is a separate, uncharged act within the meaning of Rule 404(b), this evidence is admissible under Rule 404(b)(2) because it is offered to show Defendants' knowledge and intent—that is, that Defendants joined the conspiracy *knowingly*, intending to advance the purpose of the conspiracy. Evidence of "a crime, wrong, or other act," while not admissible to prove bad character or propensity, may be admissible "for other purposes, such as proof of . . . intent." Fed. R. Evid. 404(b). In this circuit, all "other act"

10

evidence that does not serve the sole purpose of showing a defendant's bad character is admissible under Rule 404(b)(2). *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).

For each of the examples containing spoofing above, the evidence at trial will show that Defendants engaged in spoofing to stabilize, raise, or lower price because that would be advantageous to the at-risk trader, just as Defendants engaged in other conduct that was in furtherance of the charged conspiracy to suppress competition by "fixing, stabilizing, maintaining, increasing, and decreasing the price of" EUR/USD. (Doc. No. 1, ¶ 18.) For example, in the April 4, 2008 example above, Defendant Usher, who had become short EUR/USD and thus needed to buy, stated that he intended to spoof it "lowe." In addition, in the fifth example of spoofing disclosed by the Government to Defendants, on November 28, 2008, Defendant Ramchandani acknowledged that he intended to affect the price by spoofing. While Witness A was at risk (long), Defendant Usher noted "I spot b sh*t bids at 69 haah." Ramchandani then admitted the spoof bids were his because he "was trying to hold it up for [Witness A]." Because this conduct occurred during the charged conspiracy, it helps prove Defendants' knowledge and intent to fix prices while participating in the charged conspiracy. Accordingly, the evidence is permissible under Rule 404(b)(2).

## III.    The Limited Spoofing Examples are Not Unduly Prejudicial Under Rule 403

Any prejudice engendered by the concept of spoofing does not substantially outweigh the probative nature of the evidence, and thus Rule 403 does not bar its admission. Defendants express concern that the passions of the jury will be inflamed by any suggestion of spoofing, which Defendants note can be considered a separate crime, including in the context of securities. The Government does not intend to talk about spoofing as it relates to securities fraud.

Defendants also note in their motion that one of the Government's expert witnesses, Dr. DeRosa, will testify about the "impropriety" of spoofing. (*See* Doc. No. 118, 8.) In response to

11

Defendants' motion, the Government agrees it will not elicit such testimony from Dr. DeRosa on direct examination. Therefore, the evidence of spoofing is not unduly prejudicial, can be subject to an appropriate limiting instruction,[4] and is admissible under Rule 403. Evidence of spoofing is being admitted solely to explain the background of the charged conduct occurring in those particular episodes and as evidence of Defendants' intent to advance the object of the conspiracy.

For the foregoing reasons, the Court should deny Defendants' motion.

## OPPOSITION TO THIRD MOTION
## TO EXCLUDE EVIDENCE OF ALLEGED NON-COMPLIANCE WITH
## BANK COMPLIANCE POLICIES

The Court should deny Defendants' motion to exclude certain evidence that Defendants claim are compliance-related or concern alleged compliance violations. The Government has no intention of asking the jurors to find Defendants guilty because they violated bank compliance rules. Nor is any "trial within a trial" to determine the content and wisdom of the banks' compliance policies necessary. The evidence contains admissions by Defendants and is relevant to their knowing participation in the charged conspiracy and consciousness of guilt. Because of its high probative value, and because any speculative danger of prejudice or confusion can be cured with a limiting instruction, the evidence should be deemed admissible.

### I.   Defendants' Specific Examples of Compliance-Related Evidence Clearly Reveal Their Probative Nature

The exhibits identified by Defendants, while they may relate in part to bank compliance operations, are relevant for entirely separate purposes. Each exhibit contains admissions by a

---

[4] To address any concerns about potential prejudice, the Government agrees to a limiting instruction stating that the spoofing conduct does not, by itself, constitute the charged criminal conspiracy. Evidence of spoofing is being admitted solely to explain the background of the charged conspiracy and as evidence of the defendants' intent to advance its object.

Defendant of his conduct as charged in the Indictment, tends to prove his knowing participation in that conduct, and/or reveals his consciousness of guilt. Each exhibit is discussed in turn.

### A.  Defendant Usher Exhibits

i.    April 4, 2012 (JPMC-0000071746)

Evidence at trial will demonstrate that on April 4, 2012, starting at 11:36 a.m. and continuing until the 1:15 p.m. ECB benchmark fix for the EUR/USD, Defendants Usher and Ramchandani coordinated their trading in advance of the ECB fix to move price lower, to their benefit. During their coordination, Usher crowed about their "team worrrrkkkk." At 11:42 a.m. the same day, Usher, along with two other JPMorgan employees, received an email from a JPMorgan compliance employee, which is the document that Defendants seek to exclude from trial. The subject heading was "Action required – Anti-trust Guidelines." In it, the compliance employee stated that, at the request of the global head of FX, she was seeking Usher's help in developing "Guidelines for the FX business on Antitrust (anti-competitive behavior, collusion with competitors to fix or impact market prices etc.). Antitrust is any behavior or practice that may diminish competitiveness in the market or restrain trade." She specifically asked for Usher's help in providing "do's and don'ts" for the benefit of traders, including "in regard to trading ahead of currency fixes." Syme Decl. II. ¶ 3a

The Government does not intend to use this email to establish that Usher violated JPMorgan's internal guidelines, but instead to show that Usher was a knowing participant in the charged conduct. This exhibit reveals that Usher was put on notice at least as early as April 4, 2012 (if not much earlier) that traders should not act anticompetitively or collude with competitors to fix or impact market prices, and also that such conduct regarding benchmark fixes was of particular concern. Despite this knowledge—and the fact that JPMorgan managers were relying upon *Usher* to know the "do's and don'ts" of proper competition—Usher continued to

engage in the charged conduct. At the same time that Usher received this email, he was
coordinating his trading with his competitor and co-conspirator Ramchandani to move the price
of EUR/USD lower at a benchmark fix. To further this point, the Government intends to
introduce additional examples of Usher coordinating trades with the other Defendants and their
co-conspirator after Usher received this email.

      ii.    May 15, 2013 (FBI011-EDOC-00000030)

During this phone call, Usher spoke with a supervising FX trader in New York. Usher
described to her a situation in which a customer might get angry if it learned that a JPMorgan
trader had "chose[n] to build" a fix position opposite to the client's interests in order to move the
fix price ("boost the market further") and make money. Usher admitted "[t]hat sort of thing is
gonna blow up on us."  While there is no mention of bank compliance on this phone call, the
other trader does mention that a "discussion around fixes" was had the prior year when a Bank of
England representative visited the bank. Syme Decl. II. 3b.

The Government intends to use this statement as an admission of wrongdoing by
Defendant Usher as well as evidence of his consciousness of guilt. First, in the call, Usher admits
that he knows what "building" a fix position is and what it is intended to do, namely increase the
amount of currency the trader has to buy or sell at a benchmark fix in order to increase his
influence on the direction of the ultimate fix price and thereby make him more money. That is
among the things that the Government will prove at trial that Usher and his co-conspirators
conspired to do. Second, in the call, Usher also admits that bank customers who traded at
benchmark fixes would be aggrieved if they learned of that sort of behavior by traders because it
adversely affected them—another key point of the Government's case. Finally, by saying "that
sort of thing is gonna blow up on us," Usher reveals that he was conscious of the fact that
admitting one engaged in that sort of behavior—which, as alleged, he had personally engaged in

14

for years—would have significant negative consequences. In fact, the call strongly suggests that Usher had been aware of concern regarding fix-related discussions at least as early as 2012, when the conspiracy was ongoing; the other participant in the call mentions those discussions occurred "[w]hen the Bank of England was here last year."

This phone call is not about Usher violating bank rules; it is about his state of mind and his conduct.

## B. Defendant Ashton Exhibits

i.   July 6, 2012 (BARC-FX_00364613)

During this phone call, Ashton and another London-based Barclays employee discussed communication around fixes and the use of multi-bank chatrooms, including conversations with Barclays compliance. During the discussion, Ashton poses a hypothetical scenario in which "you're on a chat with say Chase, UBS, and Citi and us" and at times "everybody'll be the same way" at a fix (which, in context, means the traders are all buying or selling at the fix). Ashton says in that scenario, "you've moved the odds" in the favor of the traders, which is "the worrying part." Syme Decl. II. ¶ 3c

The Government intends to use Ashton's statements in this call as an admission of his wrongdoing as charged in the Indictment, given that Ashton's hypothetical scenario is a close description of the price-fixing conduct that he engaged in with Defendants and their co-conspirator. The evidence also demonstrates keen consciousness of guilt. The fact that Ashton posed this in the hypothetical and admitted the conduct was "worrying" are strong indications that he knew there was something wrong with what he had done and was seeking to hide it.

  ii. July 18, 2012 (BARC-FX_00360534; FBI011-EDOC-00000005)[5]

  During this phone call with another FX trader, Ashton discussed the scrutiny then being given to traders' communications with competitors concerning benchmark fixes. Ashton admitted that, at least by that time (if not earlier) he understood bank authorities deemed it "collusion" for "four big banks" that "maybe make up forty-five percent of the foreign exchange market " to share fix-related information. Syme Decl. II. ¶ 3d.

  The Government does not intend to use this document to show that Defendant Ashton is guilty of collusion because someone at Barclays said so, or even that Ashton was correctly reporting what he claims to have heard. Instead, the phone call evidences Ashton's consciousness of guilt. This call, put together with several other calls of a similar nature that the Government intends to use at trial, shows that by this time, Ashton had become fearful that others would find out what he and his co-conspirators had been doing and was seeking to hide his conduct while he determined exactly how much trouble he could be in.

  iii. July 18, 2012 (BARC-FX_01095871)

  On the same day, Defendant Ashton and a fellow FX trader had a similar discussion. On the call, Ashton agreed that sharing fix information with competitors was wrong, even if it was commonly done across the market; as Ashton put it, "it's not a defense." Ashton also confessed his fear that one day, his own chats, in which he and competing traders "high fived" each other when they were all buying at a fix and made money, will be revealed. He admitted: "[I]n the cold light of day, it's gonna look f***ing awful." Although Ashton did not explicitly identify which chat room he was so concerned about, put together with the testimony of Witness A, chat room

---

[5] These two documents are transcripts of the same phone conversation. BARC-FX_00360534 is a transcript of the conversation prepared by Barclays. FBI011-EDOC-00000005 is a transcript of the same conversation prepared by the FBI.

transcripts, and Ashton's other admissions, any reasonable juror could conclude that this is a confession by Ashton concerning the charged crime and his consciousness of guilt.

## II.    The Probative Value of the Evidence Substantially Outweighs any Potential Unfair Prejudice or Confusion

The probative value of the evidence that Defendants wish to exclude is high. First, as described *supra*, some of the exhibits contain admissions by a Defendant about the conduct charged in the Indictment. The Second Circuit has observed that when a "jury might well find that [evidence] contains direct admission by [a defendant] of his knowledge regarding his acts or admissions which are alleged to constitute violations of the law," the probative value of such evidence is "likely to be considerable." *United States v. Jamil*, 707 F.2d 638, 644 (2d Cir. 1983). Accordingly, such evidence "should not be excluded unless the danger of unfair prejudice substantially outweighs its probative value." *Id.*

Second, certain of the exhibits are probative of an element of the charged crime, namely whether Defendants knowingly joined and participated in the conspiracy. *See United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir. 1981). As the jury should be instructed, "[t]o act 'knowingly' means to act voluntarily and intentionally, and not because of a mistake, accident, or other innocent reason." (Doc. No. 114, Gov't's Proposed Final Instr. No. 3.22.) In this case, the Government must prove that each "defendant joined the conspiracy to suppress and eliminate competition for the purchase and sales of the Euro-dollar currency pair with the intent to aid or advance the object or purpose of the conspiracy." *Id.* The evidence discussed *supra* is probative of the fact that Defendants were aware of, and intended to further, the object or purpose of the conspiracy.

Third, the exhibits show Defendants' consciousness of guilt. Various types of evidence are admissible to show a defendant's consciousness of guilt. *United States v. Perez*, 387 F.3d

201, 209 (2d Cir. 2004). Consciousness of guilt evidence "is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." *Id.* (citing *United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991)). The evidence discussed *supra* satisfies all these criteria: (1) the Government does not seek to admit this evidence to show Defendants violated compliance policies or are of poor character; (2) the evidence is relevant because the jury could draw the reasonable inference from the evidence that the respective Defendant was aware of, and concerned about, his guilt; and (3) a jury instruction can make clear the limited purpose for which this evidence is offered.

Defendants have made no showing that, if these exhibits are used in the manner the Government intends, Defendants will be unduly prejudiced or the jury will be misled. That the evidence contradicts defense evidence or arguments does not mean it should be excluded. "*[A]ll* evidence incriminating a defendant is . . . 'prejudicial' . . . . In that sense, the more pertinent evidence is, the more prejudicial it is." *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986). However, "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *Id.* The evidence is highly pertinent—it goes directly to elements of the offense and Defendants' state of mind; it is incriminating, but not unfair. The evidence will also not be used to argue or imply that violating bank compliance policies is tantamount to a Sherman Act violation, nor is there any need to ask the jurors to dive into the "contours of the referenced Bank compliance policies," as Defendants claim.[6]

---

[6] Defendants cite several cases to support their argument that admission of compliance evidence risks misleading a jury. These cases are readily distinguished from this one. In *English v. District*

In sum, Defendants' professed concern that the jury will be hopelessly confused by such evidence is unfounded and could be cured by a limiting instruction. To the extent Defendants wish to offer alternative explanations for Defendants' statements within, or alternative inferences to be drawn from, this evidence, they are free to do so at trial.

### III.   The Evidence Demonstrates the Existence of the Conspiracy and Defendants' Participation Does Not Constitute Remedial Measures

Defendants' Federal Rule of Evidence 407 objection fails because (1) most of the statements are not subsequent to the conspiracy, and (2) they are not, in any event, remedial; that is, "measures . . . taken that would have made an earlier injury or harm less likely to occur." Fed. R. Evid. 407. The Government will not seek to admit any of this evidence for the purpose of proving that Defendants' banks took remedial measures to cure problematic trader conduct, and then argue to the jury that such measures must mean there was something problematic about trader conduct in the first place.

Instead, the evidence goes to the central question of whether or not the charged conspiracy existed and Defendants' knowing participation in that conspiracy, which means the evidence "does not fall within the rubric of 'subsequent remedial measures.'" *Koppers*, 652 F.2d at 299 (holding that the trial court was correct to admit evidence on the demise of the conspiracy and subsequent change in bidding patterns was not barred by Rule 407). Further, all but one

---

*of Columbia*, the district court excluded a portion of an internal investigative report containing *conclusions* about whether there had been a violation of police department policy, reasoning that such evidence would present the danger that the jury would conflate those *conclusions* with the legal issue before them. 651 F.3d 1, 6, 10 (D.C. Cir. 2011). Unlike in *English*, the exhibits at issue here contain no conclusions about whether Defendants were in compliance with bank policies; the evidence is probative of Defendants' state of mind. In *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), the court evaluated whether particular expert testimony constituted impermissible legal instruction.  Such an issue is not presented here because these exhibits are not being offered as evidence of what the Sherman Act requires; they are being offered to show the state of mind of Defendants. The Government is open to a limiting instruction articulating the narrow purpose for which this evidence is being offered.

piece of evidence that Defendants move to exclude occurred during the existence of the conspiracy. The one that post-dates the conspiracy (the May 15, 2013 phone call with Defendant Usher, *see supra* at 14, 15) is still properly admissible, because it references a conversation that took place during the conspiracy and, in the call, Usher admitted conduct constituting the implementation of the conspiracy. *Anderson v. United States*, 417 U.S. 211, 221 (1974) (post-conspiracy evidence admissible if it is probative of the existence of the conspiracy).

For the foregoing reasons, the Court should deny Defendants' motion.

## OPPOSITION TO FOURTH MOTION
## TO EXCLUDE EXPERT TESTIMONY OF JEREMY N. TILSNER AND EBS-ONLY MARKET SHARES

The Court should deny Defendants' motion to exclude portions of Jeremy Tilsner's expert testimony. Tilsner, a data analytics expert, will assist the jury in understanding Defendants' trading activity as recorded in the data. Tilsner is not an economist, and he will not be speaking to economic concepts. Instead, he will testify about trade data that corroborates the existence of Defendants' conspiracy and their execution of it. Tilsner's testimony regarding data is qualified, reliable, and highly relevant, and it should be admitted.

**I.   Tilsner is Qualified to Testify About the Data in this Case**

Tilsner is the Government's data analytics expert, and he is qualified to analyze and explain the data to the jury. He is a Senior Director at Alvarez & Marsal Disputes and Investigations, LLC, and he has fifteen years of experience in data analytics. Syme Decl. II. Ex. 1 ¶ 2. Tilsner has extensive experience in the management and analysis of financial data, particularly trading and financial market data, and including foreign exchange data. *Id.* ¶¶ 3-4.

In this case, there are two sources of raw data: EBS, the main electronic trading platform for EUR/USD; and the banks that employed Defendants and their co-conspirator. *Id.* ¶ 8. In addition to reviewing the data itself, Tilsner reviewed notes, data dictionaries, and other

20

materials from the banks and EBS regarding the data. *Id.* ¶ 15. These materials explained details about the data, such as the most relevant date or time field. *Id.* He was also on phone calls with the banks and their counsel to better understand the data. *Id.* ¶ 16.

## II.   Tilsner's Data Analysis Corroborates the Existence of the Conspiracy

Tilsner's analysis of Defendants' trading activity, as reflected in the EBS and bank data, shows that Defendants executed the coordinated trading that they discussed in chatroom communications and over the phone.

### A.  Tilsner's analysis of EBS data corroborates the existence of the conspiracy.

As alleged in the Indictment, EBS "was the electronic platform most widely used by traders during the relevant period" for EUR/USD. (Doc. No. 1, ¶ 8.) Traders used EBS to anonymously submit orders to buy and sell EUR/USD from one another. *Id.* This flow of bidding and offering created a continuous auction for EUR/USD, and the prices on EBS generally established the best price in the FX spot market. *Id.* Trading on EBS was the basis for setting both the ECB and WMR fixes. *Id.* ¶ 10. Fixes are benchmark prices for EUR/USD, and Defendants' conspiracy included coordination to affect those benchmark prices. *Id.* ¶ 9, 23(d). The Government will prove these points at trial.

Defendants' own foreign exchange expert, Prof. Michael Melvin, has stated that EBS was the "dominant" trading platform for EUR. Michael Melvin & John Prins, *Equity Hedging and Exchange Rates at the London 4 p.m. Fix*, 22 J. of Fin. Mkts. 50, 53 (2015). He also noted that for EUR, the WMR fix was based on EBS trading, specifically the window of time thirty seconds before and thirty seconds after 4 p.m. in London. *Id.*

As the Government will prove at trial, Defendants executed their price-fixing conspiracy on EBS. The EBS data contains a record of all trading activity on the platform, and Tilsner's analysis of the data confirms Defendants' execution of the conspiracy. For example, on October

21

13, 2010, Defendant Usher and a co-conspirator used chatroom communications and phone calls to coordinate their trading to affect the 4 p.m. WMR fix price. Searching through the voluminous EBS data, Tilsner identified Defendants' trading activity and found that, in the one-minute window used to calculate the WMR fix price, Defendant Usher bought 144M EUR/USD, and his co-conspirator bought 124M, making them the number one and number two buyers on EBS. Syme Decl. II. Ex. 2. The total volume of trading for all participants on EBS during this timeframe was 653M EUR/USD, so the two conspirators were over 40% of the buying on EBS. *Id.* In short, the chat room evidence shows the language of the conspiracy, while Tilsner's EBS data analysis shows its execution.

**B. Tilsner's bank data analysis corroborates the existence of the conspiracy.**

In addition to trading on EBS, the conspirators executed their conspiracy through other channels, and Tilsner's analysis of the bank data speaks to this execution. This data, produced by the banks that employed Defendants, contains a record of the trading activity of Defendants, including through channels other than EBS. For example, on January 6, 2012, Defendant Ramchandani transferred his own 146M EUR/USD ECB fix position to Defendant Ashton to give him more volume to affect the fix, which Defendants called giving "ammo." In the chat communications, Defendant Ramchandani said: "146 all day . . . uve learned who ur frienmds [sic] are today." Syme Decl. II. ¶ 6. Tilsner's analysis of the bank data demonstrates that Defendant Ramchandani did what he said: in the data, Tilsner identified the trade where Ramchandani sold 146M EUR/USD to Barclays (Ashton's bank) at the ECB fix price, using the channel RD2 (Reuters Dealing 2000). Syme Decl. II. Ex. 3. Like his analysis of EBS data, Tilsner's analysis of the bank data shows the execution of the conspiracy.

**III.     None of Defendants' Arguments to Exclude Tilsner's Testimony Have Merit**

Faced with Tilsner's qualified, reliable, and highly relevant testimony, Defendants raise a number of meritless arguments. The Government addresses these in turn.

### A.  Tilsner is not defining a relevant product market, which is an irrelevant concept in this per se case.

Defendants first argue that Tilsner is defining a relevant product market, which he is not qualified to do because he is not an economist. (Doc. No. 118, 18.) Defendants misconstrue the nature of Tilsner's testimony. Though Tilsner's disclosure uses the phrase "the Market," the disclosure makes equally clear that, in this context, the phrase simply means all participants on EBS. Syme Decl. II. Ex. 1 ¶ 18. Tilsner is not defining a relevant product market, in the sense of analyzing reasonable interchangeability and the cross-elasticity of demand. (Doc. No. 118, 19.) Instead, as made clear in his disclosure, Tilsner's analyzed *the trade data* of all participants on EBS to show the proportion of Defendants' trading on that platform. As discussed *supra*, Tilsner is qualified to conduct this data analysis.

Moreover, defining a relevant product market is irrelevant in an antitrust case that will be adjudicated under the per se rule. In its order denying Defendants' motion to dismiss, this Court has already determined this is such a case. (Doc. No. 95.) Every case cited by Defendants is a rule of reason case, and thus inapposite. *See Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) (civil merger case); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628 (RMB), 2009 WL 3241401 (S.D.N.Y. Sep. 30, 2009) (civil monopolization case); *CDC Techs., Inc. v. Idexx Labs. Inc.*, 7 F. Supp. 2d 119 (D. Conn. 1998) (civil exclusive dealing case).

The Court may likewise dismiss Defendants' suggestion that *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993) requires the definition of a relevant product market and an analysis of effect on that market. (Doc. No. 118, 18.) In relevant part, *Hartford Fire* stands for

23

the proposition that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." 509 U.S. at 796. The Government can and will satisfy the requirements of *Hartford Fire*, but that case has nothing to do with defining a relevant product market.

### B.  Tilsner will testify about his own review and analysis of the data, not the statements of bank representatives.

Despite Tilsner's qualifications in data analytics, Defendants claim that he cannot speak to direction, quantity, price, time, counterparty, or trading channel for any trade because he would "merely parrot hearsay from bank representatives." (Doc. No. 118, 21–22.) This is simply not true. The objective data itself contains the direction, quantity, price, time, counterparty, or trading channel of the trade, and Tilsner's testimony will assist the jury to identify the relevant trades. This information comes directly from the data, not a bank representative.[7]

### C.  Tilsner's testimony regarding EBS trading is not misleading, because that is a platform where Defendants executed the conspiracy.

Defendants state that Tilsner's testimony regarding EBS would be misleading because there were other channels available to trade EUR/USD, and testimony regarding EBS would not capture these other channels. (Doc. No. 118, 22.) The parties do not dispute that EBS was the main interbank electronic trading platform. Indeed, Defendants' foreign exchange expert has stated that EBS was the "dominant" platform for EUR. Melvin & Prins, *supra*. More

---

[7] As stated *supra*, Tilsner did review materials from the banks and EBS in order to better understand the data, and participated in calls with banks and their counsel with this same objective. To the extent that Defendants object to Tilsner's reliance on these materials or phone calls, that objection is unfounded. Under Federal Rule of Evidence 703, an expert may rely on hearsay in reaching his opinion if such reliance is reasonable in the expert's field. *United States v. Locasio*, 6 F.3d 924, 938 (2d Cir. 1993). Tilsner's reliance on information from the banks and EBS regarding their own data is reasonable when Tilsner is analyzing that data. To the extent that Defendants object to the data itself as hearsay, the Government will establish before or at trial that such data falls under the hearsay exception of Federal Rule of Evidence 803(6), records of regularly conducted activity.

importantly, as the Government will prove at trial, Defendants actually used EBS to execute their conspiracy, making Tilsner's testimony regarding EBS trading directly related to the charged conspiracy. As explained *supra*, to the extent that Defendants used other channels to execute their conspiracy, as reflected in bank data, Tilsner can and will speak to those trades as well.

Defendants also take issue with Tilsner's analysis of Defendants' EBS trading during specific windows of time, and comparing that trading with all EBS trading. (Doc. No. 118, 23.) Specific time intervals are relevant to the conspiracy. For example, the Indictment alleges, and the Government will prove at trial, that pursuant to their illegal agreement, Defendants and their co-conspirator coordinated their trading around (among other times) the 4 p.m. WMR fix with the intent of affecting that price in their favor. As witnesses will testify and other evidence will show, the direction, magnitude, and timing of their trading relative to all EBS traders is relevant to that goal. Thus it is relevant that, for example, on October 13, 2010, Defendant Usher bought 144M EUR/USD on EBS in the one-minute window used to calculate the WMR fix, and that his co-conspirator bought 124M during the same time. It is also relevant that their trading combined into a significant amount, over 40% of the total buying on EBS during that time. As noted by Defendants' own expert, EBS trading is the basis for setting the WMR fix price for EUR.[8] Melvin & Prins, *supra*. Defendants' substantial trading in the timeframe used to calculate the WMR fix price is relevant because it shows the execution of their conspiracy to fix prices. In short, Tilsner's testimony regarding trade data goes to the heart of the charged conspiracy.

The Court should deny Defendants' motion to exclude portions of Tilsner's testimony.

---

[8] The Government does note that the ECB fix, unlike the WMR fix, is based on a non-public methodology that uses trading data from different sources, with the fix price being the price at exactly 1:15 p.m. But again, EBS is the main electronic trading platform for EUR/USD, and Defendants used EBS in their coordination to affect the ECB fix.